[Cite as *State v. Rash*, 2020-Ohio-3318.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-01-005 |
| | : | O P I N I O N |
| - vs - | | 6/15/2020 |
| | : | |
| CARLTON RORY RASH II, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM CLERMONT COUNTY MUNICIPAL COURT
Case No. 2019CRB5345


D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

W. Stephen Haynes, Clermont County Public Defender, Robert F. Benintendi, 302 East Main Street, Batavia, Ohio 45103, for appellant


**RINGLAND, J.**

{¶1} Carlton Rash appeals from his conviction in the Clermont County Municipal Court for aggravated menacing.[1] For the reasons described below, this court affirms Rash's conviction.

---

[1] Pursuant to Loc.R. 6(A), we sua sponte removed this appeal from the accelerated calendar.

{¶2} Union Township police filed an aggravated menacing complaint against Rash, alleging that he approached the victims – Matthew and Stacy Kattine – while yelling that he was going to kill them. He also motioned as if he had a firearm. The Kattines called police, who located and arrested Rash, who was found to be carrying two knives in his waistband, one of which was in the front of his pants and the knife handle could have been mistaken for a firearm. Rash told police officers he was confronting an individual named "Randy Hughes," who had threatened him via Facebook.

{¶3} The matter proceeded to a bench trial, where Matthew testified that on November 28, 2019, at 6:30 p.m., he and Stacy were driving in his truck, a blue 2018 Chevrolet Silverado. He received a call from his mother on his cell phone and so he decided to park the vehicle to take the call. Matthew pulled into the Shell gasoline station on Mount Carmel Tobasco Road. It was dark out, but the gas station and area were well lit. He parked opposite a laundromat, which was located in a strip mall across the road.

{¶4} He was parked for approximately five minutes with his window open when he heard a "commotion" to his left. He heard someone say, "I'm going to fucking kill you." He looked to his left and saw Rash approaching. He realized that Rash was speaking to him as there was no one else around. He noticed that Rash was grabbing at his waistband like he had a weapon on him.

{¶5} Matthew indicated he feared for his life and believed that Rash meant what he said. He put the truck in drive and drove away when Rash had approached within 40 feet.

{¶6} Stacy testified that she heard someone coming from the laundromat and heard them say, "I'm going to fucking kill you." Initially she was confused, but then once she saw there was no one else around she realized that the person was speaking to them. She felt scared and urged her husband to "go, go." Stacy observed Rash go back inside

the laundromat, where it appeared that he began arguing with a female.

{¶7}   Stacy said as they were leaving, they drove by the laundromat slowly. Matthew wanted to see if he could recognize who the person was who had yelled at them. As they were driving by, Rash continued to make threatening gestures through the laundromat window, by lifting up his shirt and brandishing something. Matthew then said, "that's a gun." While Stacy did not observe the firearm, she got scared and urged Matthew to "keep going, keep going." Stacy became even more scared after they left and was physically shaking as she spoke to the 9-1-1 dispatcher.

{¶8}   Sergeant Gregory Jasper of the Union Township Police Department was dispatched to investigate. He pulled into the Shell station and saw an individual matching Rash's description. Rash looked at Sgt. Jasper and began walking away. Sgt. Jasper drove over to Rash and observed that he was accompanied by a female, who was later identified as Rash's wife, Rebecca. He observed Rash making furtive movements and Rash appeared to be positioning Rebecca between himself and the officer.

{¶9}   Sgt. Jasper got out of his patrol vehicle and ordered Rash to stop, which he did. Sgt. Jasper asked Rash if he had any firearms. Rash raised his shirt and said "No, I only have knives." When Rash raised his shirt, Sgt. Jasper noted an object tucked down the front of Rash's pants. Sgt. Jasper perceived this object to be a firearm. Sgt. Jasper estimated he was approximately 15 yards away from Rash at this time.

{¶10}  Once a backup officer arrived, Rash, who complied with police orders, was taken to the ground and secured with handcuffs. In a subsequent search, police recovered a silver knife with a black handle, in a holster, and tucked into Rash's front waistband. Sgt. Jasper identified this knife as the object he mistakenly took for a firearm. Police located a second knife secured inside the waistband on Rash's hip.

{¶11}  Union Township Patrol Officer Rick James testified that Rash voluntarily

spoke with him after being read his *Miranda* rights. Rash indicated that prior to the incident he had been talking to Randy Hughes and they had a disagreement. He had been trying to get Randy to meet him at a laundromat. He said that Randy always had illegal narcotics on him, so he intended to call for law enforcement once Randy arrived. Rash indicated that he saw a blue truck at the Shell station and believed that Randy was in the vehicle. Officer James also spoke with Rebecca. Rebecca said that she had told Rash that Randy Hughes was not in the vehicle at the Shell station.

{¶12} During his defense case, Rash called Rebecca, who testified that she and Rash were at the laundromat, waiting for a ride to Rash's mother's house. Rash handed her his two knives and then left the laundromat to go outside to meet Randy, who was in a blue truck. She walked out behind him and Rash put his hands in the air and yelled "come on if you're going to fight." The truck then left and pulled around to another store where Randy exited the truck and then "they" returned to the Shell station with police.[2] She and Rash went back to the laundromat and Rebecca returned his knives. They then started walking towards her grandmother's house when police arrived.

{¶13} Rash testified that he was at the laundromat waiting for a ride from a friend. Randy had been "talking smack" to him on Facebook and threatening to kill him and Rebecca. Rebecca told Rash that they should try to get Randy to come out to the area and then they could get him arrested for narcotics possession.

{¶14} As they waited, he saw a blue truck "pull up." Rash looked out the window and as soon as he did, he received a Facebook message from Randy stating, "I see you." Rash gave his wife the one knife he had on him. She already had the other knife in her purse. He then left the laundromat.

_____

2. On cross-examination, Rebecca clarified that the Kattines were in the truck and that Randy Hughes was riding with them.

{¶15} Rash said that he then began baiting Randy to come fight him, although he never threatened to kill anyone. He did not yell but was only trying to confirm that it was Randy. He saw that Randy and an individual named "Amberely Miller" were in the front seat of the vehicle. Rebecca then reminded Rash that Randy was known to carry a firearm. At that moment, the window on the truck went down and he ran back into the laundromat. He watched as "they crept by slowly" and "saw us in the windows." He and Rebecca subsequently left the laundromat and Rebecca handed him both knives.

{¶16} The trial court found Rash guilty. In so finding, the trial court specifically noted that it found that Rash and Rebecca were not credible witnesses. Rash appeals, raising a single assignment of error.

{¶17} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY BECAUSE SUCH VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶18} Rash argues that the greater weight of evidence indicated that he was not guilty of aggravated menacing. He argues that the Kattines presented conflicting testimony and therefore the evidence against him lacked the probative force and certainty necessary to support a conviction.

{¶19} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Bradbury*, 12th Dist. Butler No. CA2015-06-111, 2016-Ohio-5091, ¶ 17. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* An

appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.* at ¶ 18.

{¶20} The state had to prove that Rash knowingly caused "another to believe that the offender will cause serious physical harm to the person or property of the other person * * * or a member of the other person's immediate family." R.C. 2903.21. The evidence in this case supported Rash's conviction and did not weigh in favor of acquittal. Matthew and Stacy provided a consistent explanation of events, beginning with observing Rash aggressively approach their vehicle while stating that he was going to kill them. Matthew testified to observing Rash lift his shirt and brandish what he believed to be a firearm. Stacy also observed this gesturing as they were driving past the laundromat. Shortly afterwards, an experienced police officer observed an object in Rash's waistband that he perceived as a firearm. Matthew believed that Rash intended to kill them and both the Kattines were scared and shaken by the incident.

{¶21} Rash argues that the Kattines provided inconsistent testimony and points to Stacy's testimony concerning when the Kattines drove by the laundromat to see if Matthew could identify Rash. Stacy testified that Matthew again observed Rash raise his shirt and gesture as if he had a weapon. Matthew did not testify about driving by the laundromat. However, this does not make his testimony and Stacy's inconsistent. Stacy may have simply recalled more detail about the incident.

{¶22} Rash also claims an inconsistency in the Kattines' testimony as to the location they drove from before arriving at the Shell station. Matthew testified that they were travelling from home, but Stacy testified that they had come from Wal-Mart. Whether the Kattines drove from home or Wal-Mart has no relevance to what occurred at the Shell station. Moreover, this alleged discrepancy does not call into question the veracity of either

witness. On redirect, Stacy clarified that she and Matthew were at home before they went to Wal-Mart.

{¶23} As noted by the trial court, it was Rash's and Rebecca's testimonies that lacked credibility. The two combined to provide a confusing and inconsistent narrative. Rash admitted that he was a felon and former gang member and had been convicted of breaking and entering, forgery, and theft. He was observed brandishing a weapon by multiple persons, yet claimed he left his knives with Rebecca while going to confront someone who had threatened his life.

{¶24} Rebecca testified that Randy was in the blue truck with the Kattines and that she observed him getting dropped off after the truck left the Shell station. But Officer James testified that Rebecca said she told Rash he was mistaken about Randy being in the truck. Rebecca's earlier version of events could explain the argument between she and Rash in the laundromat, which Stacy observed.

{¶25} Moreover, Rebecca's earlier statement corroborates what seems to be the more reasonable explanation for Rash's behavior. That is, he approached the truck based on the mistaken assumption that Randy was in the vehicle. During his cross-examination, Matthew denied any knowledge of "Randy Hughes" and the police testified that there was never any evidence that this individual was on the scene. For the foregoing reasons, the greater weight of the evidence supports Rash's conviction for aggravated menacing.

{¶26} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.